IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JIMMIE HERSHEY,
    individually and on behalf of all
    others similarly situated,

        Plaintiff,


       vs.              Case No. 07-1300-JTM


EXXONMOBIL OIL CORPORATION,

        Defendant.



MEMORANDUM AND ORDER


    This matter is before the court on plaintiff Jimmie Hershey's Motion for Class Certification.

This prospective class action seeks an accounting for, and recovery of, amounts that Defendant

should have paid as royalties on production from Kansas wells. Plaintiff alleges that Exxon has acted

improperly in :

    (1)   reducing royalty payments for gathering charges, compression charges, processing fees,
        transportation, fuel charges, lost and unaccounted for allowances, and other "third party
        expenses" before gas is in marketable condition,

    (2)   deducting a royalty owners portion of the total severance tax reportedly paid on helium
        when no such tax was owing,

    (3)   deducting a royalty owners share of the total Conservation Fee paid when no such fee
        could properly be deducted from royalty payments,

    (4)   using a crude helium price to pay royalties on helium instead of the Grade A helium
        price that is applicable to helium that is in marketable condition, and

(5)  deducting processing, fractionization and other charges or fees from NGLs and helium before the NGLs or other constituents are placed into marketable condition.

The plaintiff's proposed class comprises:

All royalty owners of ExxonMobil Oil Corporation (including predecessors, successors and affiliates) from Kansas wells that have produced gas and/or gas constituents (such as residue gas or methane, natural gas liquids, helium, nitrogen or condensate) from January 1, 1988 to the date of class certification.

Excluded from the Class are: (1) the Mineral Management Service (Indian tribes and the United States); and (2) Defendant, its affiliates, predecessors, and employees, officers and directors.

## *Factual Background*

Exxon has working interests in more than 1700 Kansas wells, each which often has multiple royalty owners. The Kansas Geological Survey contains some 1875 entries for leases operated by ExxonMobil Oil, Mobil and Exxon Mobil Oil.

These wells generally are located on land belonging to individual owners who lack the expertise and resources to directly access the mineral wealth lying beneath it. (Dkt. 92, Reineke Aff., at 3). The landowners have entered into leases with oil and gas producers, such as ExxonMobil, in which the active role in exploration and exploitation of the minerals is undertaken exclusively by the producers. In the typical lease, the lessors receive as compensation a fractional royalty interest (1/8 to 3/16) in the value of the minerals removed from the land.

The arrangement of royal payments among the wells, and the general nature of the production from the wells, is similar. The unprocessed or "wet" gas from the wells contain various valuable minerals, including (1) methane, (2) fractionated natural gas liquids (NGLs) such as propane, butane, and iso-butane, (3) helium; and nitrogen. The production process seeks to separate

these valuable components from other substances in the raw well-head gas, including water, carbon dioxide, oxygen, and hydrogen sulfide, and improve the valuable components to marketable quality. (Dkt. 92, at 3).

Raw gas from each well is measured and tested to obtain volume and gas composition information. By condensation or mechanical process, the raw gas is separated from heavier components, and is then gathered, dehydrated, and compressed through a limited number of gathering systems. Once gathered, the gas is then processed at one of a handful of the natural gas processing plants in Kansas. These plants remove NGLs and remaining contaminants, and ensure that the remaining, "residue" natural gas is of marketable quality. (Dkt. 92, at 4). The plant thus renders four valuable products: (1) "residue" methane gas, (2) crude helium, (3) a "raw make" (or "Y grade") mixture of NGLs, and (4) nitrogen. Raw make NGLs and crude helium require additional fractionating and processing to be transformed into marketable commodities. (*Id*. at 5).

The royalties received by the prospective class of lessors are calculated under a similar procedure. Exxon first calculates in proceeds from the various gas and products that have been extracted from the gas. (Exxon Rule 30(b)(6) Resp., at 5). Next, Exxon then deducts all third party downstream charges after raw gas has left the lease. (*Id*. at 5-9, Resp. to Interog. No. 11). This practice thus excludes from the prospective royalty any accounting for mineral volumes which have been transferred in kind to a gathering line, processor or other party. (Dkt. 91 Exh. K, L, M). Plaintiff contends that these deductions or subtractions for third party costs (whether for gathering, compression, fuel, lost and unaccounted for allowances, processing, treatment, fractionization, etc.) are improper under the leases in question.

In addition, plaintiff contends that Exxon has improperly deducted from the prospective class a severance tax for helium from all royalty payments, alleging that the severance tax statute is applicable only to natural gas, not helium. Similarly, plaintiff alleges that Exxon has deducted from the class royalty a charge for the conservation fee set forth in K.S.A. 55-176. Plaintiff contends that the fee authorized under K.S.A. 55-176 is directed solely at producers, and does not include royalty owners.

Plaintiff Jimmie Hershey is a royalty owner under oil and gas leases obligating Defendant to pay him royalties. (Hershey Aff. ¶ 2, Dkt. 62 ¶ 13). Hershey has retained counsel, is familiar with the claims being asserted, and wants to see that royalty owners are properly paid. (Hershey Aff.) He is staying informed about the litigation, will consult with counsel about important issues, and understands his obligations as class representative including to represent the best interests of the class and see that the case is vigorously prosecuted. *Id.* He has accepted the responsibilities of class representative and will fulfill them. *Id.*

Exxon's main argument is that the present action arises from "thousands of different mineral leases" underlying the potential class, which would present insuperable problems in effectively managing the litigation. (Dkt. 103, at 1). Exxon emphasizes both the geographic scope of the proposed class, involving "approximately 2,000 different wells in at least seven different counties," (*id*. at 8), and the length of time for which additional royalties are sought. The intervening period, Exxon stresses, saw significant regulator changes to the industry in pipeline access and the removal of price controls. (*Id*. at 8-9). The underlying leases go back even farther in time, reaching into the early decades of the Twentieth Century, have subsequently been subjected to "unitization agreements, division orders, mortgages, wills, operating agreements, modifications, settlement

agreement, and other types of amendments." (*Id*. at 10). As a result, Exxon contends, "each individual lease file must be analyzed" to determine the specific rights of each class claimant. (*Id*.) Further, the leases were executed in states outside of Kansas, and are now held by residents many different states. (*Id*. at 11). The production from each well has also been significantly different in quality, method of production, and the method of sale. (*Id*. at 12-16).[1]

## Conclusions of Law

To certify the present claim as a class action, Rule 23 requires the satisfaction of all four prerequisites of Subsection (a), and at least one of the three contained in Subsection (b). *Amchem Prods. v. Windsor*, 521 U.S. 591, 614 (1997). Resolving this issue is committed to the broad discretion of the trial court. *Shook v. El Paso* County, 386 F.3d 963, 967 (10th Cir. 2004), *Rector v. City & County of Denver*, 348 F.3d 935, 949 (10th Cir. 2003). In exercising this discretion, the court must perform a rigorous analysis of whether the proposed class satisfies the requirements of Rule 23. *General Telephone v. Falcon*, 457 U.S. 147, 155 (1982). The court may accept the allegations in the complaint as true, but it will not "blindly rely on conclusory allegations which parrot Rule 23 requirements." *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1287 (10th Cir. 1999).

In resolving a requested certification, the court does not address the merits of plaintiff's claim. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974). However, because Rule 23's requirements are "'enmeshed in the factual and legal issues comprising the plaintiff's cause of action,'" *Shook v. El Paso County*, 543 F.3d 597, 612 (10th Cir.2008) (quoting *Falcon*, 457 U.S. at

[1]In further support its argument, Exxon has electronically submitted two expert reports, and conventionally filing multiple boxes containing historical documentation of various leasehold royalty interests. *See* Dkt. 103, at 6 n. 8.

160 (observing there is no "impermeable wall" between merits and decision to certify class)), the court must consider those elements individually, but "without passing judgment on whether plaintiffs will prevail on the merits." *Shook v. El Paso County*, 386 F.3d 963, 971 (10th Cir.2004). The court must remain focused on the requirements of Rule 23, not the merits underlying the class claim. *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 366 (4th Cir.2004); *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir.1988); *Anderson v. City of Albuquerque*, 690 F.2d 796, 799 (10th Cir.1982).

Under Rule 23(a), the prospective class claimant must show (1) the class is so numerous that joinder of all members is impracticable, (2) questions of law or fact are common to the class, (3) the claims of the representative parties are typical of the claims of the class and (4) the representative parties will fairly and adequately protect the interests of the class. Under Rule 23(b)(3), the portion of the Rule relied upon by plaintiff here, a claimant must additionally show that class treatment is "convenient and desireable." *Amchem Products*, 521 U.S. at 615. Specifically, the claimant show that (5) "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and (6) that a class action is "superior to other available methods for the fair and efficient adjudication of the controversy."

In presenting its argument, Exxon takes particular issue with Hershey's reliance (Dkt. 89, at 23) on the observation in *Esplin v. Hirshci*, 402 F.2d 94, 99 (10th Cir. 1968), *cert. denied* 394 U.S. 928 (1969), that doubts should be resolved in favor of certification — "[i]f there is an error to be made, let it be in favor and not against the maintenance of a class action." Exxon argues that "this old maxim" has been "roundly rejected," (Dkt. 103, at 3) citing decisions such as *Monarch Asphalt Sales v. Wilshire Oil Co. of Tex.*, 511 F.2d 1073, 1078 (10th Cir. 1975).

But in *Monarch Asphalt,* the court merely cited its earlier decision in *Wilcox v. Commerce Bank*, 474 F.2d 336, 344 (10th Cir. 1973) in support of *Wilcox*'s conclusion that *Esplin* should not be read to "limit unreasonably the sound discretion of trial courts in class action cases." In neither case did the Tenth Circuit "reject" *Esplin*. Indeed, in *Wilcox* the court specifically reaffirmed *Esplin* as relevant to the court's exercise of its discretion, stating that "Judge Hill's opinion in *Esplin* has been widely cited in not only justification but encouragement of class action treatment in appropriate cases *and continues to represent the considered views of this court*." 474 F.2d at 344 (emphasis added).

The *Wilcox* court approvingly quoted the Second Circuit's observation that the matter was committed to the discretion of the district court:

> In final analysis, resolution of the question now presented reverts to the "fair and efficient adjudication" problem. The trial judge will have to face this problem in a realistic way. He should be afforded the greatest latitude in the exercise of his judgment after a careful factual exploration as to how this result can be attained.

*Id*. (quoting *City of New York v. International Pipe and Ceramics Corp*., 410 F.2d 295, 300 (2d Cir. 1969)).[2]


## *Numerosity*

---

[2]ExxonMobil also cites *Zapata v. IBP, Inc*., 167 F.R.D. 147, 156 (D. Kan. 1996) as another one of the cases which has "rejected" *Esplin*. But that case merely followed *Monarch Asphalt* in concluding that *Esplin* should not be read in a way to unreasonably restrict the court's broad discretion. This court has continued to find the principle in *Esplin* useful in addressing certification issues. *See, e.g., In re Universal Service Fund Tel. Billing Prac. Litig'n*, 219 F.R.D. 661, 681 (D. Kan. 2004) (stating that the court was "mindful of the Tenth Circuit's mandate" in *Esplin*); *Robinson v. Gillespie*, 219 F.R.D. 179, 183 (D. Kan. 2003); *Geer v. Cox*, 216 F.R.D. 677, 679 n. 10 (D. Kan. 2003).

To satisfy the numerosity requirement of Rule 23(a)(1), plaintiffs must show that the class is so numerous that joinder is impractical. *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006) (citing *Peterson v. Okla. City Housing Auth.*, 545 F.2d 1270, 1273 (10th Cir.1976)). But while the plaintiff must show "some evidence of established, ascertainable numbers constituting the class, "[t]here is, however, no set formula to determine if the class is so numerous that it should be so certified." *Rex v. Owens ex rel. State of Okla.*, 585 F.2d 432, 436 (10th Cir.1978) (citing Moore's Federal Practice (2d ed.), at § 23.05(3)). Instead, the determination of numerosity arises from the facts of each case. *Id.*

Conflating the numerosity issue with another Rule 23(a) element, Exxon argues that "only a handful of the proposed class members have breach claims with common issues given the many variances in the leases." (Dkt. 103, at 19). At other points in its Response, Exxon is at pains to stress the number of proposed claims.[3] Further, in response to a slightly different class definition contained in plaintiff's Request for Admissions, it has separately acknowledged that numerosity would exist.

The court will address commonality separately. For the present, the court finds that the plaintiff's proposed class exists in sufficient numbers to satisfy the requirements of Rule 23(b). Joinder of the claims of all leaseholders would be impracticable.

### *Commonality*

---

[3]*See* Dkt. 103, at vi (the proposed class "includes almost 6,500 potential class members, more than 2,000 unique wells located all over Kansas"), and at 21 (the proposed class covers "approximately 2,000 different wells in at least seven different counties").

To establish commonality, plaintiffs must show that the members of the proposed class "possess the same interest and suffer the same injury." *Falcon*, 457 U.S. at 156, 102 S.Ct. 2364.

> A common question is one that can be resolved for each class member in a single hearing, such as the question of whether an employer engaged in a pattern and practice of unlawful discrimination against a class of its employees. A question is not common, by contrast, if its resolution "turns on a consideration of the individual circumstances of each class member. The significance of commonality is self-evident: it provides the necessary glue among class members to make adjudicating the case as a class worthwhile. The threshold for commonality is not high, and does not require that class members share every factual and legal predicate.

*Thompson v. Jiffy Lube Intern.*, Inc., 250 F.R.D. 607, 620 (D.Kan.2008) (citations and quotations omitted). A single issue of law or a single issue of fact common to the class is sufficient. *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1288 (10th Cir. 1999).

The court finds that the proposed class does present common issues of fact or law. Specifically, common issues exist throughout the proposed class as to (1) the proper basis for calculating the royalty due on helium, (2) the correct royalty for marketable condition gas, NGLs, helium and other constituents of the gas stream, (3) whether Exxon made proper deductions for severance taxes, (4) whether Exxon properly charged lessees for conservation fees, and (5) whether Exxon is subject to prejudgment interest arising from any breach.

***Typicality***

The typicality element requires that representative plaintiffs possess the same interests and suffer the same injuries as the proposed class members. *Payson v. Capital One Home Loans*, No 07-2282-JTM, 2008 WL 4642639 (D. Kan. Oct. 16, 2008); *Olenhouse v. Commodity Credit*, 136 F.R.D. 672, 680 (D. Kan. 1991). This requirement, however, does not mandate that the claims of the representative plaintiffs be identical to those of the other class members. *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir.1988). Thus, "differing fact situations of class members do not defeat typicality ... so long as the claims of the class representative and class members are based on the same legal or remedial theory." *Id.* at 675.

The inquiry as to typicality addresses "the nature of the claims of the representative, not the individual characteristics of the plaintiff." *In re Urethane Antitrust Litig.*, 251 F.R.D. 629 (D. Kan. July 28, 2008). Thus, the court looks to whether the claims of the named plaintiffs are "significantly antagonistic" to the claims of the proposed class. *Olenhouse*, 136 F.R.D. at 680, and typicality will exist if there is a sufficient nexus between the claims of the named plaintiffs and the class. *Thompson*, 250 F.R.D. at 610.

The court finds that typicality exists in that all of the members of the prospective class share interest in the propriety of the deductions in question. While the damages incurred by plaintiffs may well differ, all of the class shares an interest in determining the legality of the deductions charged by Exxon.

### *Fair And Adequate Representation*

Rule 23(a)(4) requires the named plaintiffs to show that they will fairly and adequately protect the interests of the class. The named plaintiffs must show both that they are not in conflict with those of the prospective class, and that they will be able to vigorously prosecute by qualified counsel. *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187-88 (10th Cir.2002); *Olenhouse*, 136 F.R.D. at 680.

In its Response to the Motion to Certify, Exxon makes no attempt to respond to the extensive showing made by plaintiff that counsel for the plaintiff is experienced, knowledgeable and capable of acting vigorously and professionally on behalf of the prospective class. And Exxon's only quarrel on this element as to the proposed class definition is to observe that it would "includes publicly traded oil and gas companies and royalty owners and thus producers in the industry," (Dkt. 103, at 22), thereby raising a potential conflict of interest.

In his Reply, Hershey argues that Exxon's mere hypothetical conflict should not defeat certification, but nonetheless agrees to exclude such producers. Its amended proposed class accordingly includes:

> All royalty owners of ExxonMobil Oil Corporation (including predecessors, successors and affiliates) from Kansas wells that have produced gas and/or gas constituents (such as residue gas or methane, natural gas liquids, helium, nitrogen or condensate) from January 1, 1988 to the date of class certification.

> Excluded from the Class are:

> (1)    the Mineral Management Service (Indian tribes and the United States);

> (2)    Defendant, its affiliates, predecessors, and employees, officers and directors;

> (3)    Any NYSE or NASDAQ listed company (and its subsidiaries) engaged in oil and gas exploration, gathering, processing, or marketing.

(Dkt. 115, at 14).

The court accordingly finds no substantial objection to the adequacy and fairness of the representation.

## *Predominance*

The court thus generally finds that the plaintiff has satisfied the elements required under Rule 23(a). The main issue in the case, at least as reflected in the weight of Exxon's argument, is whether plaintiff has met the required showing under Rule 23(b) by demonstrating that class issues will predominate over individual contentions, and whether proceeding by class action is the best and most efficacious manner of resolving the dispute.

The question of predominance focuses on the cohesiveness of the class claims. *Achem Products*, 52 U.S. at 623-24. Predominance may exist where "[t]he record reveals a common nucleus of operative facts which are relevant to the dispute, and the common questions represent a significant aspect of the case which can be resolved for all members of the class in single adjudication." *Sibley v. Sprint Nextel*, 254 F.R.D. 662, 676 (D. Kan. 2008).

> If the proposed class members will need to present evidence that varies from member to member in order to make out a prima facie case, then it is an individual question. If, on the other hand, the same evidence will suffice for each member to make out a prima facie case, then it is a common question.

*Payson*, 2008 WL 4642639 at *5 (quoting *In re Urethane Antitrust Litig'n*, No. 04-1616, 2008 WL 4210780 at *5 (D.Kan. July 28, 2008).

Hershey argues that the claims of the proposed class are typical, in that Exxon's methods for calculating the royalty payment from each class well is typical of royalty payment from the other

class wells. That is, Exxon followed a standard method by which raw gas from each well was measured, tested, gathered, dehydrated, compressed, and processed. All of this occurred through a limited number of Mobil processing facilities. Before processing, "drip" or "condensate" is collected and sold from the gathering lines. Exxon paid royalties for condensate gathered in its own gathering lines, but not for lines operated by others.

The processing separated the natural gas from other valuable products, including (1) crude helium, which is later refined to commercial Grade A5 helium, (2) "raw make" or Y-grade natural gas liquids (NGLs) that may be transported and fractionated to produce propane, butane, and isobutate, and (3) residue gas which is recompressed for return to the main transmission pipeline. (Dkt. 89, at 6-7). Plaintiff also stresses that Exxon employed a common method of calculating royalties paid to the class, by which it deducted all third party costs after the gas had left the leasehold. (*Id.*, at 7-9). Thus, in addition to the gas traveling by common route and processed in the same manner, the royalties paid on the gas were calculated so that the same types of deductions from royalties apply to the class.

Exxon responds that typicality cannot be determined by reference to its method of calculation. First, according to Exxon, "[i]n many instances, depending on the timeframe and the well, the gas produced by-passed the processing plant altogether or was sold at the well" to other parties, such as irrigation users. (Dkt. 103, at 20). More importantly, and returning to its main theme regarding the variant leases in question, it stresses that the claims advanced by the proposed class are charges of breach of contract, so that "the central issue" is not its method of calculation, but whether that method "breached its obligations under the various types of royalty clauses that exist in the thousands of governing leases and amending documents." (*Id.* at 20-21).

The court finds that class issues are predominant in the present contest. Although numerous individual leases underlie the claims of the prospective class, this is no bar to certification under the facts of the case.

Exxon argues no predominance exists, because the plaintiff's claim relies on "the highly criticized and antiquated view that implied covenants in mineral leases are implied in law as a matter of fairness." (Dkt. 103, at 23). According to Exxon, this conclusion is erroneous in light of *Smith v. Amoco Production*, 272 Kan. 58, 31 P.3d 255 (2001), where the court held that implied convenants of marketability are implied in fact, not implied in law. Accordingly, it argues, the claims of the prospective class can only be properly evaluated following an individualized accounting of the details of each lease. It contends that class issues will not predominate, because the court will have to address significant questions as to choice of law, because Kansas would not apply its own law to the claims of the class, as it would instead follow the rule of *lex loci contractus*, meaning it would adopt the law of the jurisdiction where each lease was executed. (Dkt. at 30, citing *Dragon v. Vanguard Industr.*, 277 Kan. 776, 784-85, 89 P.3d 908 (2004). Similarly, it argues that resolution of its statute of limitations defense requires individualized examination of the actions and intent of individual lessors. (Dkt. 103, at 27-28).

Exxon presented a similarly "multifaceted" response to another royalty deduction class certification in *Farrar v. Mobil Oil*, 43 Kan.App.2d 871, 234 P.3d 19, 24 (2010), rev. denied, Nov. 5, 2010. In *Farrar* the court affirmed a state district court's decision to certify a class action involving some 1200 leases in the Hugoton Field, alleging improper deduction for gathering and transportation costs. 234 P.3d at 22. As here, Mobil generally argued that the royalty claims did not

predominate over other claims, and that the general size of the litigation presented insuperable managerial problems. 24 P.3d at 23-24.

More specifically, it argued that certification was inappropriate because, pursuant to *lex loci contractus*, Kansas would not apply its substantive law to the entire class, but would be required to apply the laws of different states, thereby generating "a host of legal questions ... subject to various state laws." *Id*. at 24. It also argued that, in light of *Smith*'s implied-in-fact language, certification was inappropriate because a class action would require the review of "'thousands of leases and amending documents with materially different royalty clauses that were executed at various times under varying circumstances.'" *Id*. (quoting Mobil).

The Court of Appeals disagreed. On the choice of law issue, the Court of Appeals squarely rejected Mobil's argument, holding that the cases Mobil cited in support of its *lex loci contractus* argument were either dicta or not on point. The court found that "[o]ur Supreme Court has consistently applied the law of Kansas to disputes requiring the construction and enforcement of oil and gas leases covering Kansas real estate." 234 P.3d at 25. In fact, the court wrote, the matter was relatively clear"

> In *Smith*, 272 Kan. 58, 31 P.3d 255; *Sternberger v. Marathon Oil Co.*, 257 Kan. 315, 894 P.2d 788 (1995); *Shutts v. Phillips Petroleum Co.*, 240 Kan. 764, Syl. ¶ 4, 732 P.2d 1286 (1987) ( *Shutts III* ); *Matzen v. Cities Service Oil Co.*, 233 Kan. 846, 667 P.2d 337 (1983); and *Lightcap v. Mobil Oil Corporation*, 221 Kan. 448, 562 P.2d 1 (1977), there were not any serious contentions made that any other state's law rather than Kansas law should govern the resolution of disputes involving oil and gas leases covering Kansas properties, and our Supreme Court either impliedly or expressly held that the law of the situs of the lease properties (*lex rei sitae*) should be applied in such cases. *See also Wortman v. Sun Oil Co.*, 241 Kan. 226, 232, 755 P.2d 488 (1987), aff'd, 486 U.S. 717, 108 S.Ct. 2117, 100 L.Ed.2d 743 (1988) (regarding statute of limitations application). In fact, the only occasion where our Supreme Court seems to have applied *lex fori* to a dispute such as this, *Shutts v. Phillips Petroleum Co.*, 235 Kan. 195, 221-22, 679 P.2d 1159 (1984), the United States Supreme Court reversed the court on its choice-of-law doctrine in favor of the

determination that the "laws of the States where the leases were located" should be applied. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 815-23, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985).

234 P.3d at 25-26.

The court also recounted some of the history of the petroleum lessor's duty of marketability under Kansas law, *id.* at 29, coupled with Mobil's contention that the implied-in-fact language in *Smith* altered that legal landscape. The court rejected this argument, finding that "[t]he limited issue in *Smith*, however, was whether the implied covenant to market gas produced from the leasehold was implied in fact or implied in law *for purposes of selecting the proper statute of limitations*." 234 P.3d at 29 (emphasis in *Farrar*). Not only was the issue in *Smith* limited, its actual effect was minimal, the *Farrar* court noting that *Smith* had also proceeded to cite additional authority and ask "'Does it make any difference whether covenants are implied in fact or in law? Judging from the reported cases, the answer seems to be, not often and not much.'"" 234 P.3d at 30 (quoting 272 Kan. at 73).

> The *Smith* opinion is limited to holding that implied covenants are implied in fact for purposes of the statute of limitations. The opinion contains no hint that the court intended to overrule in any way prior cases which have not required proof of a factual intent for implied covenants to exist. And most importantly, if this were the case, *Smith* would have required a very different remand that may well have destroyed the prerequisites for a class action. Instead, the remand directed only a finding on whether the implied covenants were breached. 272 Kan. at 85, 31 P.3d 255.

*Id.* at 30.

The court then more broadly rejected the general, underlying-intent-of-the-parties inquiry that Mobil sought to inject into the certification question.

> A federal court of appeals long ago in a very celebrated and still viable case applying Kansas law suggested that implied covenants within oil and gas leases are not so

much a function of intent but rather of the obligation inherent in the language of the contract:

> Implication is but another name for intention, and if it arises from the language of the contract when considered in its entirety, and is not gathered from the mere expectations of one or both of the parties, it is controlling.

*Brewster v. Lanyon Zinc Co.*, 140 F. 801, 809 (8th Cir.1905) (noted for its "continued vitality" in 5 Williams & Meyers, Oil and Gas Law, §§ 802, 806 [2009]).

Treatise law is in agreement — specific intentions of the parties to an oil and gas lease are of no legal moment to the existence of covenants implied from the express language of the contract:

> When it comes to the application of an implied covenant to a particular dispute, courts may move some distance away from the fact of parties' intention and closer to the law as an instrument for enforcing ethical norms. Thus when the lessor sues the lessee for his [or her] failure to use sandfracing to increase production, he may claim as a fact that he expected diligent efforts to be made to maximize production, but he can hardly claim that he expected the use of sandfracing when the lease antedated the invention of the process.

5 Williams & Meyers, Oil and Gas Law § 803, p. 24.

Indeed, one need not examine parole evidence, surrounding circumstances, or extant industry practice to determine whether such covenants should be implied. This has simply never been the law or practice in Kansas.

Thus, Mobil's contentions appear to read far too much into the *Smith* opinion. No direct language in *Smith* indicates that the implied covenants which have been read into oil and gas leases for years are hereafter to be proven to be within the subjective intent of the parties at the times the leases were entered into. As before, implied covenants are essentially presumed to be the intent of both parties and need not be proven by reviewing the specific intent of the executing parties; individualized proof of intent has never been required. We do not see that *Smith* intended to change this practice when its focus was solely on the statute of limitations issue. And most importantly, had the court been interested in an examination of individualized lease variations and circumstances surrounding formation, the remand would have been far different than ordered. *See* 272 Kan. at 60-61, 31 P.3d 255.

Mobil's suggestion that such an individualized examination defeats the prerequisites for class action has been characterized as the de rigeur defense of such class actions and rejected by most courts. *See* McArthur, A Minority of One? The Reasons to Reject the Texas Supreme Court's Recent Abandonment of the Duty to Market in Market-Value Leases, 37 Tex. Tech. L.R. 271 (Winter 2005). With Texas notably the stand-out nonconformist jurisdiction, most courts have rejected this defense when faced with remarkably similar facts. *See, e.g., Duhe v. Texaco, Inc.*, 779 So.2d 1070, 1082 (La.App.2001) (class certified despite each royalty owner having a different lease, noting that "the underpayment was systemic, through one common course of conduct, giving rise to a common nucleus of operative facts"); *Bice v. Petro-Hunt, L.L.C.*, 681 N.W.2d 74, 77-78 (N.D.2004) (standardized conduct toward the royalty owners presents a common nucleus of operative facts even if differences in lease terms); *Shockey v. Chevron U.S.A.*, No. 98,063 (Okla.App., unpublished opinion filed April 4, 2003) (class certified despite 45 to 50 variations in lease language).

We align our court with those of Louisiana, North Dakota, and Oklahoma in holding that in a purported class action claiming improper calculation of royalties, there is no need to examine individual lease formation and the intent of the parties thereto for purposes of determining predominance of common issues or manageability in certification proceedings where there has been shown a systemic common course of conduct by an oil and gas lessee in calculating royalties payable. We agree with the district court and its rationale in rejecting Mobil's argument that a need for individualized examination of lease formation and language defeats predominance of common issues or otherwise renders this case unmanageable as a class action.

Having so held, we are not suggesting that all purported class members can be treated identically. Although Mobil does not seem to rely on the obvious major categories of potential class members in challenging the district court's certification order, it was noted by the district court and it appears to this court that those for whom a 1984 settlement is applicable will likely need to be treated differently than those for whom the settlement is not applicable. Moreover, the record reflects that among the leases at issue, some were executed or amended recently to expressly abrogate the implied covenant that underlies the plaintiffs' class allegations. These and other easily defined categories of potential plaintiffs, however, need not bar initial class certification.

234 P.3d at 30-31.

Judge Vratil recently reached a similar conclusion in *Freebird, Inc. v. Merit Energy*, 2011

WL 13683, No. 10-1154-KHV (D. Kan. Jan. 4, 2011), certifying a class alleging improper natural

gas royalty deductions. As here, the defendant conceded that it had calculated the deductions applying a similar methodology, but argued that the class claims did not predominate because they represented "a 'mass breach of contract action' in which the individual issues dwarf the common issues." *Id*. at \*5. In support of its argument, defendant also relied on *Smith v. Amoco*, contending that the case demonstrated that under Kansas law, the duty of marketability is implied in fact, and that as a result "each lease must be individually construed." *Id.*

Analyzing *Smith*, the court found the cited language not dispositive as to the issue of certification. *Id.* at \*6. Further, reviewing Kansas cases addressing the duty to market, including *Sternberger v. Marathon Oil*, 257 Kan. 315, 331, 894 P.2d 788, 800 (1995), the court ruled that while the Kansas Supreme Court

> has not expressly held that application of the implied covenant to market does not require a fact specific, lease-by-lease inquiry, *its jurisprudence in this area indicates that no such inquiry is required*. To determine whether an implied covenant applies, Kansas courts do not engage in fact-specific inquiry into the circumstances of the parties' assent to the lease or the circumstances of the parties' assent to the lease. Typically, they simply state that an implied covenant applies, and the parties dispute whether one or the other breached it. In short, absent an express lease provision to the contrary, Kansas courts seem to presume that implied covenants apply to all oil and gas leases.

*Id*. at \*7 (citations omitted). Accordingly, and in light of the plaintiff's specific allegation that common evidence would demonstrate the existence of liability to the class, the court concluded that the element of predominance existed. *Id*. at \*8.

This court reached a similar conclusion in *Roderick Revocable Living Trust v. XTO*, 679 F.Supp.2d 1287 (D. Kan. 2010), finding that Kansas law imposed a general implied duty of marketability.

The court finds that this conclusion finds ample support among other cases which have approached the question of class certification in oil and gas litigation. Courts have consistently found that such an approach can be justified, notwithstanding a producer's argument that the element of predominance is defeated by the need to focus on individual lease language. Exxon argues that plaintiff's theory is "the highly criticized and antiquated view," (Dkt. 103, at 23), but its position would be substantially stronger if it were to cite *even a single case* which has accepted its argument that individual leases trumps certification. (See Dkt. 103, at 23-36).

In addition to *Firebird,* this court has granted certification in *Eatinger v. BP*, No. 07-1266-EFM, 271 F.R.D. 253 (D. Kan. 2010) (finding predominance element met by gas producer's alleged "failure to pay royalties or the methods and/or formulas used in calculating royalties"); *Schell v. Oxy U.S.A., Inc.*, No. 07-1258-JTM, 2009 WL 2355792 (D. Kan. July 29, 2009),  and *Northern Natural Gas v. Grounds*, 292 F.Supp. 619 (D. Kan. 1968). Kansas generally has a "long history of certifying class actions" involving oil and gas leases. *Dragon v. Vanguard Indus., Inc*., 277 Kan. 776, 787-88, 89 P.3d 908 (2004) (citing cases). Kansas District Court cases granting certification in royalty infringement cases include *Farrar v. Mobil Oil Corporation*, No. 01-CV-12, Stevens County Kan. Dist. Ct. Aug. 18, 2009), *Littell v. OXY*, No. 98-CV-51 (Stevens County Kan. Dist. Ct. March 13, 2001), *Youngren v. Amoco Prod. Co.*, No. 89-C-22 (Stevens County Kan. Dist. Ct. February 28, 2001), *Coulter v. Anadarko*, No. 98-CV-40, (Stevens County Kan. Dist. Ct. Aug. 23, 2000),  *Alford v. Pioneer*, Case No. 93 CV 37 (Stevens County Kan. Dist. Ct. Oct. 3, 2000), and *Smith v. Amoco Prod*. Co., Case No. 99 C 21 (Stevens County Kan. Dist. Ct. Sept. 16, 1999).

Decisions in Oklahoma and Colorado have reached similar conclusions. See, e.g., *Anderson v. Merit Energy Co.*, Nos. 07-cv-00916-LTB and 07-cv-01025-LTB-BNB, 2008 WL 2484187 (D.

Colo. June 19, 2008); *Parry v. Amoco Prod. Co.*, No. 94CV105 (La Plata County District Court, Colo. July 15, 1996). In *Beer v. XTO Energy, Inc*., No. CIV-07-798-L, 2009 WL 764500 at *5, 7 (W.D. Okla. March 20, 2009), the court certified as a class action claims for royalty deductions, specifically rejecting defendant's individual lease predominance defense. "Defendant attempts to manufacture conflicts between the class members based on differences in lease language and Btu content of the wells. As noted above, however, defendant's identical treatment of all royalty owners has made these differences irrelevant." *Id*. at *5.[4]

The defendant's class-wide treatment of prospective members, following a unfied underlying royalty methodology, supports the conclusion that class issues will predominate. The court has reviewed the extensive filings submitted by Exxon, and finds nothing there which compels a different conclusion. While Exxon argues that additional documents — unitization agreements, division orders, mortgages, wills, operating agreements, modifications, settlement agreement, and other types of amendments — may have resulted in transfers in the leasehold ownership interest, the fact remains that under Kansas law the core element of the claims of the prospective class's claims arise from the original lease documents. And the court's review of defendant's evidentiary submissions confirms that these original leases were not individually-crafted, unique acts of draftsmanship, but arose from standardized form contracts used by oil and gas companies. *See Winkler v. DTE, Inc*., 205 F.R.D. 235, 243 (D.Ariz.2001) (rejecting argument that individual issues would predominate breach of contract claim where standard form contracts were at issue).

---

[4] The court later decertified the class based upon issues relating to the adequacy of class representation, *Beer v. XTO Energy*, 2010 WL 1490069 (W.D. Okla. April 13, 2010), but vacated this Order when new class representatives intervened. 2010 WL 2773311 (W.D. Okla. July 13, 2010).

Resolving the actual ownership interest, and if proven, damages owing to each class member will require substantial effort in documentation, but these are matters which can been effectively resolved by careful accounting and expert review. Further, these are issues as to damages, which do not control the court's determination as to certify the proposed class for liability issues.

Exxon's remaining arguments, including its statute of limitations defense, do not justify denial of certification. Exxon argues that, to effectively respond to the plaintiff's claim for fraudulent concealment tolling of the statute of limitations, it will need to individually examine each member of the class to determine their subjective understanding of the leasing and accounting process. However, the fact that Exxon may have a statute of limitations defense against some class members will not invalidate the class. *See Shutts II*, 235 Kan. at 208. In addition, the plaintiff's response to the Exxon's statute of limitations defense is not restricted to fraudulent concealment, but also includes a claim that the defense is unavailable under the open accounts doctrine.

## *Superiority*

The element of superiority under Rule 23(b)(3) requires a demonstration that a class action is the best practical method for resolving the dispute. *Telephone Billing Practices*, 219 F.R.D. at 679 (D.Kan.2004) (citing Fed.R.Civ.P. 23 advisory committee notes to the 1966 amendments). Under this element, approval of a class action is justified where the alternative of individual suits "would be grossly inefficient, costly, and time consuming." *Id. See also Sibley*, 254 F.R.D. at 676 (finding class action was superior and indeed "only feasible way" for dispersed nationwide class suffering relatively small injuries to obtain relief). The element of superiority incorporates considerations of manageability, which "encompasses the whole range of practical problems that may render the class

action format inappropriate for a particular suit." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974).

The court finds that a class action would be the best means of resolving the claims of the prospective class. As noted earlier, resolution of all aspects of the claims of the prospective class will require careful and patient accounting, but much of this may be done through computer-assisted categorial treatments rendered after issues of liability are addressed.

The court notes that Exxon, concluding its argument that its constitutional rights will be violated in the absence of particularized analysis of the history of each individual lease, cites the Supreme Court's reference to the "deep-rooted historic tradition that everyone should have his own day in court." *Ortiz v. Fibreboard, Inc*., 527 U.S. 815, 846 (1999) (internal quotes and citations omitted). (Dkt. 103, at 36).

The court rejects Exxon's constitutional argument, as stated above, for the same reasons the Kansas Court of Appeal rejected it in *Farrar*. But Exxon's citation to *Ortiz* is indeed relevant here. Given the circumstances of the case and the relatively small amounts involved for each individual royalty owner, the only way that each royalty owner can effectively "have his own day in court" is by certification.

## Evidentiary Hearing

Exxon has moved for a separate evidentiary hearing. It argues that an evidentiary hearing is the norm, but the authority it cites (Dkt. 102, at 2) does not fairly support this proposition. Exxon accurately quotes *Anderson v. City of Albuquerque*, 690 F.2d 796, 800 (10th Cir. 1982) (internal citation, quotation, and elipsis omitted) as stating: "Based on an evidentiary hearing, the court must

determine whether the individual's claim and the class claims share common questions of law or fact and whether the individual's claim will be typical of the class claims."

This suggests that *Anderson* was announcing a rule applicable to all district courts. But at this point in *Anderson*'s progression through the courts, the Tenth Circuit court had already found that the grounds on which the district court had denied class certification were untenable, reflecting an erroneous understanding of the plaintiff's burden, 690 F.2d at 799, and found that remand was necessary. The cited language is a directive to the district court in *Anderson* on how to proceed following the remand. Nothing in the opinion suggests that the court was attempting to set a standard requirement for evidentiary hearings in all instances of class certification.[5]

And indeed, courts generally emphasize that hearings are "typically held" because the court "does not accept the plaintiff's allegations in the complaint as true." *Monroe v. City of Charlottesville*, 579 F.3d 380, 385 (2009). In the present case, of course, the court is not limited to the bare, facial allegations contained in Hershey's complaint. The court has been provided with multiple expert reports and affidavits by both parties. ExxonMobil itself, to underscore its individualized-lease argument, has conventionally filed boxes containing thousands of pages of evidentiary materials. The court has carefully reviewed the parties' voluminous evidentiary submissions, and Exxon cannot credibly argue that it has not been accorded ample opportunity to present facts in opposition to the certification.

---

[5] The other authorities cited by ExxonMobil are treatises, which reach differing conclusions, generally far more equivocal than suggested by the passage quoted from *Anderson*. *Cf.* 5 Moore's Federal Practice, § 23.82[2] (Matthew Bender 3d ed.) (evidentiary hearings should be held "if there is any doubt regarding the issue of class certification"); with 7AA Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d § 1785 (2005) ("in many cases a hearing is deemed appropriate and useful").

This court has explicitly held that evidentiary hearings are not required in all cases of requested class certification. In *Connett v. Justus Enterprises*, 125 F.R.D. 166, 167 (D. Kan. 1988), Judge Theis concluded, after reviewing the plaintiff's burden as to certification, that "[a] full evidentiary hearing is not, however, required." The court quoted the Supreme Court's observation in *Falcon*:

> Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question.

*Id.* (quoting 457 U.S. at 160). *See also Antonson v. Robertson*, No. 88-2567-S, 1989 WL 94820, *1 (D. Kan. July 27, 1989). The court finds a separate evidentiary hearing is neither necessary nor would it be helpful.

## Additional Pleadings

On October 1, 2010, after the plaintiff had filed his Motion to Certify, Jean Farrar filed in this action a "Statement" (Dkt. 117) on behalf of herself and the plaintiff class in *Farrar et al. v. Mobil Oil Corp.*, Case No. 01-CV-12 (Stevens Co. Kan. Dist. Court). Plaintiff Hershey moved to strike the Statement. (Dkt. 118). On November 5, 2010, the United States Magistrate Judge granted Hershey's motion. (Dkt. 121). In response to this ruling, Farrar has filed an additional Objection (Dkt. 123), to which Hershey has duly filed another Motion to Strike. (Dkt. 125).

The court finds that the Magistrate Judge properly struck the earlier Statement, that the Objection is without merit, and it is denied. Hershey's additional Motion to Strike is denied as moot.

The original statement was properly struck on either of two alternative grounds. First, as a person who is not a party to the action and has filed no Motion to Intervene, Farrar is not entitled to file pleadings in the action seeking relief. *See* Fed.R.Civ.Pr. 24. Rule 24 provides a specific vehicle for any person contesting a class certification to present his or her objections, and its provisions are not optional. Farrar has presented no authority authorizing informal pleadings in opposition to a class certification by persons who are not parties and who indeed explicitly disclaim (Dkt. 123, at 5) any interest in intervention or becoming a party. None of the cases cited by Farrar in the subsequent Objection hold to the contrary.

Second, and just as importantly, the cases cited by Farrar in the Objection were not presented to the Magistrate Judge for her consideration. Plaintiff's Objection is essentially a Motion for Reconsideration of the ruling of the Magistrate Judge, but Farrar has made no attempt to show why such authorities (even assuming they were relevant and suggested a different result) were not presented in a timely fashion to the Magistrate Judge prior to her ruling.

Just as Rule 24 is not an optional, suggested means of presenting opposition to a proposed class certification, D.Kan.R. 7.4 —with its provision that in the absence of a timely response, the court "[o]rdinarily will grant the [unopposed] motion without further notice"—is a binding requirement on all litigants appearing before the court. The Magistrate Judge notl only did not act clearly erroneously, but was absolutely correct in granting Hershey's Motion to Strike in the absence of a timely response.

In light of the court's conclusion that the Magistrate Judge committed no error and the Objection lacks merit, the court finds that plaintiff's Motion to Strike may be denied as moot.

Finally, the court notes plaintiff has separately filed a Motion for Leave to Supplement (Dkt. 132), seeking to bring notice of two additional decisions to the attention of the court. The cited cases were previously reviewed by the court, and the Motion for Leave is also denied as moot.

IT IS ACCORDINGLY ORDERED this 31st day of March, 2011, that plaintiff's Motion to Certify Class (Dkt. 88) is granted as provided herein, plaintiff's Second Motion to Strike (Dkt. 125) and Motion for Leave (Dkt. 132) are denied as moot; defendant's Motion for Hearing (Dkt. 101) is denied; and non-party Jean Farrar's Objection to Order (Dkt. 123) is overruled.

s/ J. Thomas Marten\
J. THOMAS MARTEN, JUDGE